Sheriff of Bay County. Good morning. All right, Mr. Klotz, whenever you're ready, you may proceed. Thank you, Your Honors. Good morning. Thank you for having me here. My name is Chris Klotz. I represent the plaintiff, Daniel Bennett, in this particular case. We're the appellant in this issue. Up here in front of you guys, you all, on a motion for summary judgment that was granted in favor of the case. I do want to let you know, you may already know this, my co-counsel who wrote the brief is very, very ill. I found out Monday evening that I was going to be making this oral argument today. And so, I think she'll be okay, but I did want to let the court know that I ordinarily probably would have been a ton more prepared. She is our brief writer, but I believe that I'm going to be able to answer your questions that you have and give you some good information, hopefully, from me. So, I'd like to start out just by kind of talking about an analogy that I tried to come up with that I think is relevant to this case. Let's say I'm feeling like I'm having a heart attack and I go to the hospital. And I walk into the emergency department. And I'm short of breath and my heart's racing and I look bad. And the people at the triage desk say, Klotz, we'll go ahead and get you to the back. You can skip the waiting room. We're going to take you and put you in a room in the back where we can maybe watch you a little bit closer and see how you're doing. And so, as I'm having my heart attack, I'm back in the room waiting for somebody to come give me some medical care and my condition's getting worse and worse and worse. And everybody's seeing it happening. And there are nurses and medical people walking by. And there's mental health people walking by. And there may be even a security guard at the hospital that's walking by making notes about how I'm doing while I'm back there in the waiting room. And all of a sudden, I just keep getting worse and worse and worse. And that's obviously the scenario that we have here with Daniel Bennett who was not having a heart attack but was having a psychotic break that everybody witnessed pretty much from day one when he came into the jail. He came into the jail, it was Saturday, July 11th. When he came in and then he removed both of his eyeballs with his own fingers over a week later on Tuesday, July 21st when he bilaterally self-nucleated is the medical terminology for removing your own eyeballs. This man came in psychotic. The record reflects that he came in in a state of agitation. If you were able to have the time to read the back story and the rest of the record, we didn't get to talk about it very much in the brief. His dad or his granddad was a town doctor and had called the police to come to their house because their grandson was acting funny and they wanted him Baker-acted. They didn't Baker-act him. They arrested him for something that was actually, again, it's in the record, that ended up being kind of a trumped-up charge. Didn't he chef the grandmother or something? He was asking his grandma not to put milk in his granddad's bowl of cereal and apparently there was a push and shove, but it came out in the record that that was all fabricated just so the police would have a reason to get him out of the house. I know they dismissed the charges. Yes, ma'am. Yes, your honor, they did. I don't want to get into the weeds on that too much, but he came in very psychotic. Let's start it out at a two or three out of 10. A few days later, he attempted suicide by putting a bag over his head and a t-shirt tied around his neck. It was so severe that the officers had to pepper spray him to get him to stop from attempting to kill himself. Didn't they then put him into a suicide watch area? They put him back in the suicide watch area. They said he's now a suicide risk. They put him on Suicide Precautions 1 and they put him back in the isolation room by himself. Once they do that- Suicide Precaution 1 was the most severe classification. When he came in on July 11th and was acting out, he was put on behavioral observation from the beginning, but then when Howell saw him on July 17th, put him into the highest level Suicide Precaution 1. That's correct, Judge Branch. What else would you have had Howell do? Can I address something that you just said? I will answer your question. That's important that you noted about the behavioral observation when he came in because you know who did the behavioral observation of him? It was Defendant Gray. Defendant Gray was involved with him from day one when he came in. Now, to answer your question, Your Honor, there is-and I was going to get to this later, but Judge Branch, this is a good time to get to it. This is, again, part of the record that we didn't really get to cover that much in the brief for you all, but if you are able to take a look at Ms. Gray's deposition, because I know that one of my jobs today is to show you how that the defense were subjectively aware of the risk that they were putting Mr. Bennett into, and Judge Rosenbaum, I've read your dissent, or not, your concurrence in the McDade case, and it kind of goes along with that. The policies and procedures Defendant Gray and Howell were aware of, so to answer your question, Judge Branch, what I have expected them to have done, once he started manifesting the more psychotic behavior, for instance, the things that were observed and reported throughout our brief, and then the suicide attempt, and then the things that happened after them, Defendant Gray in her deposition, when I asked her about policies and procedures, and I'm sorry I don't have the precise citation, but it's Defendant Gray's deposition on page 118 through about 122, where this all comes out, about her knowledge of medical policy and procedure 9.3, and I'm going to paraphrase some, but I got her deposition, it's not completely in the brief, but I'm going to paraphrase some. It says, and if you look down at medical 9.3, page 85 of Plaintiff's Exhibit 1, where it describes somebody as being gravely disabled, which is the definition section which defines gravely disabled as a condition which a person as a result of a mental disorder is in danger of serious physical harm resulting from a failure to provide for their essential human needs of health or safety or manifest severe deterioration in routine functions evidenced by repeating and escalating loss of cognitive or volitional control, which is all over this case, over their actions and is not receiving such care as is essential for their health or safety. My question, do you understand what gravely disabled is to Defendant Gray? And she says, yes. And I said, this would have been in the policies and procedures book that you're aware of, correct? Yes. And you would agree with me that Mr. Bennett was exhibiting symptoms of a mental disorder on that day? On that day? Yes. Again, I'm paraphrasing, Your Honors. And that he exhibited self-harming behaviors, correct. Moving on through this, moving to the Plaintiff's Exhibit 1, I don't have time to go through everything. Let me go back to what we know that Howell, when he evaluated Bennett, he placed him on the most protective suicide prevention unit. Because they had other options. And I didn't get to finish this, but I wasn't getting to your point quickly enough. The point is, there were a ton of medical options, and there was a psychiatrist on staff. There were medical options for treatment with antipsychotic medications. You disagree with what Howell chose. Howell chose highest level suicide prevention. What evidence is there that Howell knew that that wasn't going to be sufficient? Good question. I don't disagree with that at all. I think suicide prevention protocol 1 was 100% necessary, but it is not medical treatment. 100% it is not medical treatment. Any more than me getting moved back to the room in the emergency room when I'm having my heart attack is not medical treatment. Moving the plaintiff from one location to another location and not giving him any mental health or medical treatment while he's there is not medical treatment. So this is a pure case of zero medical treatment. Relocation of Mr. Bennett. You seem to be jumping to the fact that he should have been medicated somehow. There's nothing in the record to suggest that he ever had this kind of issue before or that he was under any kind of medication. To me, if I use your analogy, it's you're put in the back, you're being treated for the heart attack, and then sort of you, you know, it turns out that you had, I don't know, a stroke or that you had something completely unforeseen right to what you were retreating at. I want to take you back to Wade and the standard at Wade because you don't mention it in the opening brief, but the standard is that the defendant has to be subjectively aware that his own conduct, and here would have to be Howell for Howell and Gray for Gray, of course, that their action or inaction, that that's what put the plaintiff in the substantial risk of harm. What's the evidence of that? Yes, Your Honor. So I think I can answer that. They were the, Howell and Gray were the only people who knew what his conditions were wholly in a gestalt, so that's one thing. They were the ones who ordered, Howell was the one who ordered a daily assessment of Dan Bennett, which you will recall didn't happen. Gray was there on Saturday and Sunday, but he was not seen. The order to assess him on a daily basis was done on Friday. Howell said he shall have a daily assessment. Gray was in the jail on Saturday and Sunday, did not see him while she was there in jail, so the order was not followed. That's the, if there's anything that's arguably treatment, and I wouldn't concede necessarily that an assessment is a medical treatment because all it is is just another observation. They didn't give him any counseling. They didn't do any testing. They refused the counseling, though. They did offer it to him at one point, and he refused it, and she does see him on Monday, and so he is evaluated the day before this happens. May I address that, Your Honor? I disagree that she saw him on Monday. If you will notice, our argument in the brief and throughout the record, that record of her assessment on the 21st is backdated, backdated, and our experts that we had said that it's inappropriate protocol and it's not proper. Our argument at trial is going to be that she crafted that at some point later to cover herself, so that is circumstantial evidence of the fact that she didn't do the assessment. The other circumstantial evidence of the fact that she didn't actually do that assessment is that her assessment checked all the boxes being normal, where for the last three days everything about Mr. Bennett had not been normal at all. That's circumstantial evidence that she fabricated the report and fabricated the assessment. She did check the box keeping him at the suicide prevention level one, correct? Yes, Your Honor, I believe so. He was in the highest suicide prevention care, and she kept him there and actively checked that box. She doesn't have the ability to take him off. She didn't have to check the box. That's correct. Again, the suicide prevention is not treatment. It's not treatment. All right. Thank you very much, Mr. Klotz. You've reserved five minutes. We'll hear next from Ms. Yarbrough. Thank you, Your Honors. May it please the Court. Good morning. My name is Alyssa Yarbrough, and I represent the Sheriff. And then together with Carol Rooney, my co-counsel, we represent Jack Howe and Shanderica Gray. I will be delivering the argument today since I represent all three of the defendants that were involved in the motion for summary judgment. Turning initially to the claims against Mr. Howe and Ms. Gray, as this Court recognized the standard and weighed, is in focusing only on the subjective element at this point because plaintiff must meet both elements, the objective component and the subjective component. But with the subjective component, there are three things that must be met. That the defendant was subjectively aware that plaintiff was at a risk of serious harm, that the defendant disregarded that risk, and that the defendant acted with subjective recklessness as used in criminal law. And as this bench correctly noted, when Mr. Howe met with Mr. Bennett on June 17th, he did not disregard a risk of serious harm. He recommended that he be placed, and he did in fact place him, in Suicide Precaution 1 where he would be under the strictest observation. He would have the least amount of access to things. In fact, he only had a blanket and a mat in the cell with him. And that he would also be observed by correction staff more closely than if he were in general population or even behavioral observation. And so as I understand Mr. Klotz's argument, I think he's saying, that's all well and good and they should have done that, but that's not treatment, that's not medical treatment. That doesn't help him to get better, to stop trying to harm himself. That just, if he tries to harm himself, hopefully they'll catch it, but it doesn't stop the problem. So, what is your position with respect to Mr. Klotz's argument that no one there tried to actually treat his psychotic break as opposed to just monitoring his behavior? First, the only claims about deliberate indifference were brought against Mr. Howe and Mrs. Gray. And we have to look at what they knew themselves, not what other people observed, not what other people may have been aware of that they were not aware of when they assessed him or when they analyzed him. As far as treatment goes, Mr. Bennett had been in the jail, booked in on July 11th, and self-nucleated on July 21st. It had been 10 days. And Mr. Howe testified that part of the evaluation process was leading toward treatment, it was getting to know the inmate. Mr. Bennett came in with no diagnosis of any kind, no medication, which is separate and apart from cases that Plaintiff's Counsel relied on in their opening brief, specifically Gleason and Steele. And so the position of Mr. Howe for what he was subjectively aware of was that Mr. Bennett on July 17th attempted an act of self-harm. He placed him on Suicide Precaution 1, where he would be monitored, and ordered that he be evaluated Monday through Friday, consistent with the Bay County Jail's Suicide Precautions Procedure 602. But did he order treatment of any type or any kind of evaluation so that he could maybe receive treatment at some later point? He ordered additional evaluations that may have at some point led to recommendation for treatment. But there was nothing that Mr. Howe knew that necessitated a call to the medical field at that point, or the medical department in the jail. Was he aware or was he under the impression that Mr. Bennett was having a manic break? He made a note that he was having psychomotor agitation, which he explained just means that he could not sit still, he was fidgety, but that he was participating in the evaluation, and when he was offered counseling, he didn't want any. Well, with respect to counseling, I mean, when you're talking about somebody who is having some mental health difficulties, I mean, is it appropriate to defer to what they want with respect to counseling? If they're not going to participate in counseling other than continuing to evaluate and document what he's observing, I'm not sure that there's anything else Mr. Howe could have done at that point, which is why he then recommended and put him on suicide precaution one, which is the strictest placement in the Bay County Jail. So this case seems to straddle the line between medical necessity cases and self-harm cases. Do we need to fall down on one side of that line or the other? I don't believe so, Your Honor, because of the mental health assessments were done, medical care was provided. There's evidence in the record that Mr. Bennett was being seen every day, twice a day by medical, the nursing staff, following COVID protocols. There's also evidence that on July 20th, the suicide protocol was reviewed by the ARMP, Ms. Lesko, and that she signed off on it. So medical was also involved, but this turned strictly to what Mr. Howe and Ms. Gray knew and were involved in, and that's the analysis that the court should follow for under Wade v. McDade for deliberate indifference. Here we have a situation where Howe, when he evaluated Mr. Bennett, did move him from behavioral observation to suicide prevention one and said there needs to be constant monitoring. I think that's different from what happened when Gray saw Mr. Bennett, and there are more incidences of at the time she sees him, we've had the bag over the head, we've had the species smeared on the walls, we've had the paint chip issue, and yet she seems to, and she said she can't remember how long she met with him. It could be as little as 10 seconds. He was nonverbal with her but did thumbs up, which seems weird in response to some of these questions. How do we not look at sort of her glowing recommendation, so to speak, and see that as a complete failure to provide any sort of care, any sort of benefit? Because she recommended that he remain on suicide precaution one, contrary to what Mr. Klott said, where she couldn't remove him unilaterally from suicide precaution one. She could have made, like Your Honor noted, she could have made a recommendation that he be downgraded, but she didn't, even though she noted in her evaluation of him that he was not demonstrating any suicidal or homicidal ideations at the time that she evaluated him. Suppose her, this is a hypothetical, suppose in this circumstance we have the evaluation form for Ms. Gray and she had checked everything that Mr. Howell had checked when he was evaluating Mr. Bennett. What would have happened in that circumstance with that completed form from Gray as opposed to the circumstance we have where everything was great? Would anything else have happened? Like if she had said, yes, we still have these serious problems, would additional care have been provided to Mr. Bennett or would he just have stayed in suicide prevention one? That's a hypothetical that I don't know that there is an answer to, but she would have recommended that he remain on suicide precaution one, which was the option that was available to her, and more importantly, even the behaviors that he was exhibiting on the 18th and 19th of which there's no record evidence that Ms. Gray was actually aware of those because those were things handled by the security side and they were addressed, and every time they corrected a behavior that Mr. Bennett had, he responded positively to that correction and complied. But weren't the incidents, I guess by the time that Gray went in to do her evaluation, weren't the incidents displayed somewhere like on the door, like there were sheets that were filled out, so she would have had access to that information? Two certain incidents, but not all of them necessarily because there was one that I believe he was written up for taking a light bulb out of a socket. I don't think that was connected to the door because that was a disciplinary action that she may have not been aware of. But in that document, he was asked to provide the light bulb to the security staff and he handed it to him and complied. You walked through the three steps on the subjective risk. How does she pass those? How is it that she's not disregarding the serious risk? How is it that she's not exhibiting subjective recklessness by checking everything and saying everything is fine? Because she recommended that he stay on suicide precaution one. She didn't downgrade him. She recognized that there was still a potential for self-harm and that he needed to continue to be monitored as he was. And on the subjective recklessness, the plaintiff must also show that the defendant was actually subjectively aware that her own conduct caused a substantial risk of serious harm to plaintiff. By leaving him on the most restrictive monitoring in the jail, the plaintiff can't meet that burden to show that Ms. Gray knew by saying he needed to remain on suicide precaution one that her actions would cause Mr. Bennett to self-harm. And by recommending that he remain on suicide precaution one, she acted reasonably. There's nothing in the record that indicates when she evaluated him that he needed to be seen by medical staff. No injuries, no complaining of ailments, no anything of that nature. She evaluated him and then recommended that he remain on suicide precaution one. And in this case, plaintiff just cannot meet the burden that is set for deliberate indifference because neither Mr. Howell on July 17th acted with deliberate indifference. He never acted with subjective recklessness as used in the criminal law context, which is a very high standard. And then Ms. Gray, when she evaluated him on July 20th, didn't act with that criminal recklessness either by recommending that he remain on SP one. The defense would ask that this court affirm the district court and find that neither Mr. Howell nor Ms. Gray acted with deliberate indifference because plaintiff has failed to meet that burden. And then briefly referencing the claim against the Monel liability claim against the sheriff, Mr. Bennett cannot establish that the sheriff was liable under Monel because respondent superior is not a basis of liability. So the sheriff in this situation, as the district court correctly held, cannot be liable for the actions of his employees who allegedly failed to follow policy. Second, there was no policy or custom of the sheriff that plaintiff has been able to identify because one does not exist that was the alleged moving force behind any potential constitutional violation. And furthermore, there was no constitutional violation in this case. This court has held in Harris versus Thigpen that the constitution does not require that mental health care be perfect, the best obtainable or even very good. And in this situation, Mr. Bennett was in the jail for 10 days. Each behavior was responded to. Mr. Bennett, excuse me, Mr. Howell acting on the knowledge that he had on July 17th placed him in suicide precaution. And then Ms. Gray determined he should remain in suicide precaution so he can continue to be monitored. As it pertains to count three, which were the negligence claims against Mr. Howell and Ms. Bennett, Ms. Howell, sorry, Mr. Howell and Ms. Gray, this court should affirm the district court's ruling that because plaintiff has failed to meet the deliberate indifference standard, which is the same standard for Willful and Wanton, which is what was alleged by plaintiff and argued by plaintiff, there can be no negligence claim either because pursuant to 768.289A under the Florida statutes, an employee cannot be liable unless there is evidence that he acted in bad faith or with Willful or Wanton disregard or malicious purpose. And bad faith and malicious purpose are both much higher standards than even that of Willful and Wanton, and plaintiff has not established that. And we would ask that the court affirm. Counsel, can I bring you back to this objective recklessness standard because in the Wade case, Judge Jordan in that concurrence notes that there's still an objective standard when there's some response, right? So there is some response here. We have to objectively then look as to whether that response is reasonable or not. I mean, arguably, right? So if that's true, don't the experts create an issue of fact as to whether or not the response is reasonable or do we just never get to reasonable response? I would submit both. The experts do not create a disputed issue of fact as to whether or not the response was reasonable because that turns to a difference of opinion regarding treatment and care that was provided. And this court has held in Brown v. McClure that courts are generally reluctant to second-guess judgments where a prisoner has received some attention, even if it doesn't rise to the level of attention that experts think was appropriate. And then this court has also held that expert opinions do not typically create disputed issues of fact as such that there would be a jury question from that, especially when it comes to care and treatment that was provided. Are there no other questions? I ask that you affirm. Thank you. All right. Thank you very much. Mr. Klotz, you've reserved five minutes. Judge Branch, if I can go back to one of the questions that you asked Ms. Yarbrough. You talked about the failure to remove Mr. Bennett from Suicide Precaution I and how that relates. Let me explain my theory, which would be a jury question, is that our position, is that the reason why Ms. Gray didn't remove him from Suicide Precaution I when she did the assessment that everything was just fine is because she didn't do it. And she didn't do that, but she doesn't want to take him off Suicide Precaution because eventually it's going to come to light that she didn't actually see him. And so if she hasn't seen him or hasn't really assessed him and then makes a recommendation to take him off Suicide Precaution I after she's fabricated her visit with him, that's why she didn't make a recommendation to take him off. At least that is a plausible issue of fact for us to argue to a jury. Now, I believe that the record, and I don't think we covered this too heavily inside of our briefing, but you will remember that Mr. Howe was out for a family emergency on Monday, and that's how Ms. Gray gets to see Mr. Bennett for the assessment on Monday, which was a sham assessment. Remember that the record shows that Ms. Gray saw by herself in a different pod somewhere between, I think it was 25 to 35 patients a day. And when she was covering for Mr. Howell, who in the record, Ms. Gray's testimony was that Mr. Howell saw the much more severe people. He saw about 40 people or more a day. So on Monday, when Ms. Gray is doing this rosy assessment of Mr. Bennett, when he is in a psychotic spiral and self-harming, she's seeing her 30-odd people and she's seeing Howell's 40-odd people. And Howell has the more serious people. I don't believe she ever saw him, and that's why she gave him a glowing review, which was backdated, which our experts say is inappropriate. And that at least is a question for a jury to consider. And if I can point this out, Judge, so I hope I addressed that issue with you a little bit. The issue . . . There's allowed to be circumstantial evidence of the deliberate indifference knowledge that the Wade v. White Day case requires. Also, it's also very clear that experts can create an issue of fact, and I want to point out, I don't think the trial judge gave enough consideration to the expert opinions that we had. And Dr. Conrad, I'm just going to use him as an example, he's the only MD. He's the psychiatrist expert that we hired. And he said, and I think this is in a brief, there was not a single in-depth evaluation of this man. There is no treatment plan made for this man to try to get him better. There's no offer of therapy. They did not move him to the infirmary. They did not transfer him to the hospital. All of those, I think, were great transgressions by the Panama City Jail. Another quote, Mr. Bennett was clearly in need of medication treatment, but they continued to just leave him in his cell and monitor him by video and let him kind of be. I think that's in document 6440, page 59, 12 through 18. Another quote, by Dr. Conrad, creating an issue of fact by the expert, which is unrebutted by the other side, by any expert. Our doctor says there was no evidence of psychiatric intervention or treatment in the records. And if you go back and look at all the records that he read, he read everything. He watched the videos of Mr. Bennett pulling his eyeballs out. Dr. Conrad, in his deposition, read everything. And he said there was no evidence of psychiatric intervention or treatment in the records. Dr. Conrad also said, and that's in document 88-10, paragraph 5, which I think is his report, Dr. Conrad said, medical intervention is required anytime someone is psychotic. This man is clearly psychotic for days and days and days. And if you'll recall, when he got discharged to go to the hospital after he pulled his eyeballs out, they had to medicate him and have him under anesthesia in a coma for 48 hours. Then when they sent him back to the jail, you'll remember the medical director at the jail says, we're not qualified to handle him. As a matter of fact, Sasser said, and this is in our brief, it says, the hospital physician plans to discharge Mr. Bennett back to the jail. We are not equipped to meet his needs at this time. He requires acute inpatient psychiatric care to address his current mental health state. Right, but that's the current is the operative thing. You would agree that having already removed his eyes might have given him a different, would have aggravated the mental state that was different than it was on the 21st or the 20th? I thought about that. And here's, so here's the treatment for pulling your eyeballs out. They sew your eyelids shut. That's it. There's really almost no more treatment than that. And the- No, not the medical treatment. You don't think that that might have some psychological effect on you? When he got out of the hospital, he had been under heavy anti-psychotic medication. So when he got back and he was coming back to the jail, he was on heavy, heavy psychotropic medication. So I think that he was actually probably at least heading in the direction of trying to get better. But the point is, I don't think he got worse when he went to the hospital. He was already that bad when he was in the jail for days. And so I don't discount what you're saying. When he comes back from the hospital to the jail, could he have been worse than when he left? I could only speculate on that. But I can tell you that the last part of Sasser's letter was, should Mr. Bennett be released from custody, his mental state will be the primary focus initially. Just going back for one second. Your Honor, did I answer your question? I'm sorry. Enough. You would ask me about him coming back from the hospital. All right. Well, I think you're out of time. So if you want to just quickly sum up. I'll just sum up by saying our expert uncontrovertedly said, medical intervention is required anytime somebody is psychotic. This is not a, was the treatment good enough case? This is, we warehoused this guy in an isolation room where, and I'm sorry I didn't even get to get to Monell. You'll see in there, they weren't watching the video at the time he removed his eyeballs and they had a policy of not doing that and they have a long history for many years of not providing adequate mental health care where people have either self-harmed or killed themselves. And this facility is notorious for this. So thank you very much for your indulgence and thank you for your questions and your interest in the case. All right. Thank you, counsel. We'll be in recess until tomorrow.